[Civ. No. 5841. First Appellate District, Division One.—July 12, 1928.]

RESIDENTIAL DEVELOPMENT COMPANY (a Corporation) et al., Petitioners, v. SYLVESTER ANDRIANO et al., as Members of the Board of Supervisors of the City and County of San Francisco, etc., Respondents.

Theodore J. Savage for Petitioners.

John J. O'Toole, City Attorney, and Dion R. Holm, Chief Deputy City Attorney, for Respondents.

CASHIN, J.—A proceeding in *mandamus* to compel respondents to make a proportionate distribution of the remaining part of a fund known as the "Twin Peaks Ridge Tunnel Assessment Fund," which was created by the assessment upon land owned by petitioners and others of the cost of constructing the Twin Peaks tunnel in the city and county of San Francisco.

On March 3, 1913, there was adopted by the Board of Supervisors and approved by the mayor of the city and county a resolution of intention, numbered 10,020 (new series), to order the construction of the tunnel mentioned and to assess the cost, including that of construction, the acquisition of rights of way, damages to property and incidental expenses, upon two assessment districts, in which were situate the lands of petitioners. Thereafter on November 25, 1913, the board, with the approval of the mayor, adopted resolution numbered 10,545 (new series) confirming a report by the Board of Public Works and making and levying an assessment upon the districts mentioned in the sum of $3,955,011.29 for the purpose of defraying the cost of constructing the tunnel, including the other expenses in that connection. Subsequently the municipality acquired the necessary land and rights of way, a contract for the construction of the tunnel was entered into, and the work was completed on or about July 27, 1917. An ordinance of the city and county known as the "Tunnel Procedure Ordinance" provides a method of procedure for the construction of tunnels within the municipality and for the levying of assessments on private property to defray the cost thereof. It also provides for the levy and collection of the assessment before the contract for the work is let based upon an estimate of the cost of construction, the necessary acquisition of private property, with the damage thereto and incidental expenses, and further that the assessment shall be collected by the tax collector of the city and county

either in cash or installments, or in the event of a delinquency by a sale of the property assessed. The ordinance provides that the resolution of intention shall contain a general description of the construction contemplated (sec. 2), and that a copy of the same shall be transmitted to the Board of Public Works, and that the latter shall prepare a plan showing the gradients of approaches to and the passageway through the proposed tunnel (sec. 3). Notices of the passage of the resolution are required to be posted and published, and thereafter within thirty days any owner of property claiming damage by reason of the proposed tunnel may file with the Board of Public Works a petition showing the estimated amount of damage (sec. 4). Thereupon this board is required to determine such damage and estimate and assess the total amount thereof, together with the other expenses of construction, upon the land benefited (sec. 5). It is their further duty to file with the Board of Supervisors a report including, among other things, (1) plans, profiles, cross-section, and general specifications of the work required for the completion of the tunnel and appurtenances thereto; (2) an itemized estimate of the cost of the proposed tunnel, including damages that may result therefrom to property and all incidental expenses; (3) a map showing the district or districts as specified in the resolution of intention, and a list of the parcels assessed, with an estimate of the benefits to be received by the construction of the tunnel (sec. 6). A notice of the filing of the report is required to be given (sec. 7), and any person interested objecting to the construction of the tunnel, to the plans and specifications therefor, to the extent of the assessment district, or to the amount of the damages or benefits estimated in the report, may file a protest in writing. Such protests are required to be heard by the Board of Supervisors at a time fixed by notice (sec. 8), when the board may by resolution confirm the report, and upon such confirmation it is provided by section 10 that the report and list filed shall "be and constitute the assessment made and levied for defraying the damages, costs and expenses of such tunnel construction, and the amount of the benefits set opposite each parcel of land shall constitute the amount of the assessment thereon."

No opportunity is afforded the property owner to object to the assessment proceedings previous to the filing of the report by the Board of Public Works, following which, however, the property owner may object not only to the project as a whole but also to the manner of doing the work as shown by the plans and specifications.

Section 28 of the ordinance provides that should the estimate levied appear to be insufficient to fully complete and pay for the construction of the tunnel in conformity with the plans and specifications, the Board of Supervisors may levy a supplemental assessment upon the district or districts for the amount required, or in lieu of a supplemental assessment may provide for payment by the city and county of the amount necessary to complete the construction. Section 31 provides that the board in its discretion may order that not more than one-half of the whole of the cost and expense of any work mentioned in the ordinance, or the damage resulting therefrom, be paid out of the treasury of the city and county from such fund as the board may designate. The last section also requires that when the work has been completed and all damages and incidental expenses have been paid the Board of Public Works shall make a ratable and proportionate distribution of the entire actual cost based upon the original assessment, and issue an order to refund to all persons who have paid an excess either on the assessment or for interest the amount thereof, and that the Treasurer shall pay such order from the fund.

Under section 17 the property owner is given an option to pay his assessment in ten annual installments upon signing what is called an installment agreement, by which he is required to pay interest on deferred payments at the rate of seven per cent per anunm, it being also provided by section 25 that such interest payments of which a separate account is required to be kept, shall be used to pay interest on the bonds or certificates issued to the contractors; and by section 22 that any surplus in the interest account shall by resolution of the Board of Supervisors be transferred to the assessment fund.

The levy in the present case followed the filing of a report by the Board of Public Works, together with plans and specifications and an estimate that the work would cost

$3,955,001.29, upon which an assessment for a like sum was levied by the Board of Supervisors. The contract for the construction of the tunnel let as above stated provided that "said work shall be done according to the plans and specifications hereto annexed and made a part of this contract, and the materials used therein shall comply with the specifications."

The answer to the petition admits that with the exception of certain sums transferred to the assessment fund from the funds of the city and county, and which they alleged have not been restored, the entire cost of the work, including construction, the acquisition of land, rights of way, damages to property and incidental expenses, has been paid, and that the records of the Treasurer of the city and county show a balance or overplus in the assessment fund of $42,508.21. It is claimed by petitioners that this amount should be distributed to the property owners as provided by the ordinance, and by respondents that the sums paid into the fund by the property owners were insufficient to complete the tunnel; and that the overplus shown is the unused balance of moneys transferred for that purpose from other city funds and should be retained by the city.

This proceeding having involved a determination of questions of fact, a referee was appointed, before whom evidence, both oral and documentary, was adduced by the parties. The correctness of the Treasurer's account of the receipts from the assessment and from other sources is not disputed; but petitioners contend that certain expenditures made by the city were improperly charged against the fund, and that the sums received exclusive of any advances made by the city were sufficient after paying all proper charges for the construction of the tunnel to leave a surplus in the assessment fund. They further claim that the sums advanced by the city were in lieu of a supplemental assessment, were made under the provisions of section 28 of the ordinance for the purpose of completing the tunnel, and that any surplus thereof remaining in the fund should be shared *pro rata* by the property owners.

As to the last contention, however, it will be sufficient to say that the sums advanced were transferred from other funds to the assessment fund for the purpose of meeting the demands of the contractor for which the latter fund was

temporarily inadequate, and nothing appears from the resolutions of the Board of Supervisors authorizing the transfers or from the evidence which would justify the conclusion that the same were in lieu of a special assessment or made with the intention of thereby providing for the payment by the city and county of any part of the cost of building the tunnel.

The evidence shows the following receipts and expenditures in connection with the work, the items of which are numbered from 1 to 14:

*Receipts:*

| | | | |
|---|---|---:|---:|
| 1. | From assessments .........| $3,903.910.93 | |
| 2. | From interest ............| 767,484.53 | |
| 3. | From the sale of old improvements ............| 9,617.70 | |
| 4. | From the Redemption Fund.| 32,608.25 | $4,713,621.41 |

*Advanced by the city:*

| | | | |
|---|---|---:|---:|
| 5. | From the Good Roads Fund | 8,500.00 | |
| 6. | From the Municpal Railway Fund .................| 82,152.53 | 90,652.53 |
| | Total .........| | $4,804,273.94 |

*Expenditures:*

| | | | |
|---|---|---:|---:|
| 7. | Paid contractor on his contract ..................| $3,709,919.00 | |
| 8. | Paid contractor for extras..| 122,160.74 | |
| 9. | Paid for incidental expenses | 34,577.70 | |
| 10. | Paid for land in fee simple..| 511,098.00 | |
| 11. | Paid for easements........| 6,528.00 | |
| 12. | Paid to leaseholds..........| 3,840.00 | |
| 13. | Paid interest on bonds or certificates issued to contractor ..................| 352,243.94 | |
| 14. | Transferred from Assessment Fund to General Fund...| 21,398.35 | |
| | Cash balance May 31, 1927......| 42,508.21 | |
| | Total .........| | $4,804,273.94 |

It appears from the above that the total amount paid by the taxpayers, together with the sums received from the sale of improvements situated on lands taken for the tunnel, was

$4,713,621.41, and that the total expenditure, including the extras, so-called (item No. 7 above), which petitioners contend were improperly charged against the fund, was $4,740,367.38. The apparent deficit of $26,745.97 was counterbalanced by the advances made by the city, the net amount of which was $69,254.18, the balance to the credit of the fund being the sum of $42,508.21, as shown by the books of the Treasurer.

In addition to the allowances for extras the petitioners also except to the payment from the fund of an award made by the Industrial Accident Commission against the city for the sum of $4,500 for the death of a city employee who was killed in the tunnel, and to the cancellation by the Board of Supervisors of assessments aggregating $9,271.92, assessed against 181 parcels of property owned by the city and which were situated in the assessment districts.

It appears that certain labor and material consisting of 32 items, including the two last mentioned, were allowed as extras, for which a total of $122,160.74 was paid from the fund. That certain of these items were properly allowed is clear from the evidence, but we are of the opinion that others were improperly charged to the fund. These items are numbered in the report of the city engineer, which is in evidence and will be hereinafter referred to by the number used therein.

The sum of $858.10 (item 24) was paid for labor and material in excavating the west portal and westerly portion of the tunnel to conform with a planned subdivision to be known as West Portal Park. The further sum of $14,526.40 (item 26) was spent in making additions to and changes in the construction of Laguna Honda station, which, according to the report, were made in order "to conform to the high class architecture of the surrounding dwellings."

The above excavations and additions were clear departures from the original plans and specifications, increased the cost in the above amounts, and were made, as shown by the evidence, for no other purpose than to further private interests.

Item 27 covers a substitution of tile for plaster in the Eureka Valley and Laguna Honda stations for the purpose of obtaining, according to the report, "a more sanitary, lasting and more sightly wall covering," and for which the sum of $9,450.05 was expended. This change was also a depart-

ure from the original plans and specifications, and the expenditure was made, as fairly appears from the evidence, for the same reasons that led to the extra expense covered by items 24 and 26.

The contractor was required to restore all surface pavement which, due to the work of constructing the tunnel, might be destroyed. At the time the contract was let the city contemplated the construction of what is known as the Market Street extension, which lies above the eastern end of the tunnel. These plans were completed before certain Market Street crossings, the pavement upon which had been removed, were restored by the contractor as provided by his contract. In order to save the city the additional expense of reconstructing the restored crossings to conform with the plans for the Market Street extension it was agreed that the contractor should pave in accordance with the new plans and not with the original plans referred to in his contract. For the additional services shown by item 32 the contractor was allowed the sum of $13,162.44. He was also allowed the sum of $5,374.34 (item 33) for paving Collingwood Street to conform with the Market Street extension plans, which street had been reconstructed to conform to the new plans adopted after the contract for the construction of the tunnel had been let. As shown by item 34 the sum of $9,262.16 was spent for the construction of a retaining wall at Ord Street in accordance with the Market Street extension plan and charged to the assessment fund. After more extensive studies of the Market Street extension plan the city determined to construct a two-level street north of the easterly approach walls of the tunnel, and the reconstruction of the pavement at Market and Seventeenth Street in accordance with the new plan led to the further expenditure of $1,112.47 as shown by item 39. None of the work done or materials furnished shown by the last five items was within the resolution of intention or the original plans and specifications; no estimate of the benefits, if any, to the lands in the districts by reason thereof was made by the Board of Public Works; no opportunity to be heard was afforded the property owners, and the result of these expenditures from the assessment fund was to charge all the land in both assessment districts without regard to benefits with the cost

of a project having no necessary connection with the construction of the tunnel.

What we have said respecting items 24 and 26 applies also to item 36 of $962.88. This sum was expended for labor in changing what are called the Eureka Valley kiosks. As stated in the engineer's report, "Above the Eureka Valley station a two-level street with a dividing wall was planned for the Market-street extension, but owing to the protests of the property owners the plans were changed."

In addition to the foregoing it appears that on July 2, 1915, an employee of the city and county, namely, an inspector attached to the office of the city engineer, was killed while inspecting the work in the tunnel. An award against the municipality in the sum of $4,500 was made by the Industrial Accident Commission to the widow of the deceased and paid. This sum was also charged against the fund. The city and county was the employer of the inspector within the provisions of the Compensation Act (Stats. 1913, pp. 279–286) and liable thereunder, but failed to protect itself by insurance as it was empowered to do. The evidence shows no reasonable ground for shifting to the property owners a loss which by the use of ordinary foresight might have been prevented, and the same was not properly chargeable to the fund.

It was shown that 181 parcels of realty owned by the city were found to be benefited by the proposed improvement and that the same were assessed for a total of $9,271.92. Section 33 of the tunnel procedure ordinance provides that "city and county property may be assessed for any benefit as other property if it appears that such property is benefited, and the amount thereof shall be paid as ordered by the supervisors upon the completion of the work or as progress payments as other demands are paid." On February 25, 1924, the Board of Supervisors adopted resolution number 22,156 (new series), declaring that the assessments upon property owned by the city and county for the construction of the Twin Peaks tunnel should be canceled; that the lien of the assessment thereon was thereby discharged, and directing the tax collector to cancel the same. None of the parcels mentioned was excluded from the assessment districts by the resolution of intention, and it is not contended that the parcels were not benefited by the improvement, the

only ground for the attempted cancellation being that the same were owned by the city. This ground alone was insufficient in view of the tunnel ordinance and the previous assessment to support the action of the board.

While, as stated, the petitioners except to other items, the foregoing comprise all the items reasonably shown by the evidence to have been improperly charged against the fund. The amounts so paid from the fund or charged against the same total the sum of $55,072.84. This, with the award of the Industrial Accident Commission of $4,500, which was a charge against the city and county alone, and the amount of its assessment, which should have been paid or credited to the fund, aggregate the sum of $68,844.76. The account of the Treasurer shows a balance to the credit of the city and county for moneys advanced of $69,254.18, the difference between this balance and the sums chargeable to the city and county being the sum of $409.42. The actual balance shown in the assessment fund is $42,508.21; and had the proper charges and credits to the fund been made the balance therein to the credit of the property owners would have been the sum of $42,098.79, which under the ordinance should be distributed *pro rata* to the property owners, including the city and county, and the excess of $409.42 retained by the latter.

The respondents contend that the claims of petitioners are barred by certain provisions of the charter, by section 3804 of the Political Code and section 338 of the Code of Civil Procedure. We find no merit in this contention. The fund is held in trust for the purposes provided by the ordinance, and the statute of limitations commenced to run only from the date of demand (*Miller & Lux* v. *Batz,* 142 Cal. 447 [76 Pac. 42]; *MacMullan* v. *Kelly,* 19 Cal. App. 700 [127 Pac. 819]).

It is ordered that a peremptory writ of mandate issue out of and under the seal of this court directing the distribution by respondents or their successors in office of the sum of $42,098.79 now in the Twin Peaks ridge tunnel assessment fund; that said Board of Public Works made a ratable and proportionate distribution of the entire actual cost of the work described above based on the original assessment, and issue an order to refund to persons, including the city and county of San Francisco, who may have paid an

excess, either on the assessment or for interest, a ratable and proportionate share of the above amount; that the Auditor of said city and county audit and its Treasurer pay the same, and that respondent Board of Supervisors do and perform such acts as may be necessary to effect such distribution in accordance with the views above expressed.

Tyler, P. J., and Knight, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 6, 1928.

All the Justices concurred.